UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRADLEY JONES, on behalf of
himself and others similarly situated,

      Plaintiffs,

v.                                       Case No.  8:17-cv-54-T-24 JSS

RS&H, INC.,

      Defendant.
_____/

**ORDER**

      This cause comes before the Court on Defendant's Motion for Summary Judgment.

(Doc. No. 61).  Plaintiffs oppose the motion.  (Doc. No. 76).  As explained below, the motion is

granted.

**I.  Standard of Review**

      Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The Court must draw all inferences from the evidence in the light most favorable to the

non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d

1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of

showing the Court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial.  See id. (citation omitted).  When a moving party has

discharged its burden, the non-moving party must then go beyond the pleadings, and by its own

affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background

Plaintiffs Bradley Jones, Paula Taylor, and Hamid Ashtari worked for Defendant RS&H, Inc. for many years, until their employment with Defendant was terminated during a June 2015 reduction in force ("RIF").  Thereafter, Jones filed a collective action against Defendant, alleging that his selection for the RIF was a result of age discrimination.  Taylor and Ashtari opted into this collective action.

### A.  Plaintiffs and the Decision-Makers

Defendant is a multi-disciplined design firm that provides fully integrated architecture, engineering, and consulting services.  It has five business divisions, and Plaintiffs all worked within the Tampa Transportation division.  Within the Tampa Transportation division, there were five subgroups: (1) roadway, (2) drainage, (3) project development and environmental ("PD&E"), (4) traffic design, and (5) structures.  Jones was a designer in the traffic design subgroup since 1992.  Taylor was an administrative assistant in the PD&E subgroup since 2000.  Ashtari was an engineer in the drainage subgroup since 1993.[1]

At the time of the RIF, Michael Dixon (age 51 at the time) managed everyone in the Tampa Transportation division.  Dixon reported to Regional Manager Rick Chesser (age 68 at the time).  Chesser and Jesse Forst (the Operations Manager for the Transportation division nationwide; age 42 at the time) both reported to Practice Director Lisa Robert (who was responsible for the strategic direction, business performance, and leadership for the Transportation division nationwide; age 45 at the time).

---

[1]Ashtari left Defendant and worked for two other firms for about a year-and-a-half during 2000–2001.

### B.  The Decision to Have a RIF

 Every month, Robert and Forst would look at the company's financial statements and workload projections to evaluate the company's financial performance and to determine how many workers were needed to complete the work that Defendant had.  (Doc. No. 73-7, depo. p. 34, 36; Doc. No. 73-5, depo. p. 23).  In October of 2014, the Transportation division's financial performance began to decline, so Robert and Forst were monitoring future workload.  (Doc. No. 73-1, depo. p. 33–34, 37; Doc. No. 73-6, depo. p. 103).

In monitoring the future workload, Robert and Forst considered: existing work that Defendant had, contracts Defendant had won but were not yet signed, and contracts that Defendant was pursuing.  (Doc. No. 73-7, depo. p. 39; Doc. No. 73-6, depo. p. 15).  Robert and Forst projected the workload for the following six and twelve months and analyzed it by division, region, and office.  (Doc. No. 73-7, depo. p. 39; Doc. No. 73-6, depo. p. 18).  Thereafter, Robert and Forst had discussions with Chesser, the Regional Manager, regarding the concern that there was not enough projected future work to support the employee headcount.  (Doc. No. 73-7, depo. p. 37, 40, 42).  Specifically, they told Chesser that based on their projected workload analysis, Chesser had ten to twelve too many employees within his region in the Transportation division. (Doc. No. 73-7, depo. p. 42, 43).

The number of excess employees is determined by projecting the company's future workload and determining how many employee hours are required to complete that workload. The number of employee hours needed is then converted to determine how many employees are needed to complete those required hours.  That number is then compared to the number of current employees in order to determine the number of excess employees that would not be

utilized for the projected workload.

Stated differently, Defendant makes money by billing its employees' work hours to clients, and that is what Defendant calls "utilization." (Doc. No. 73-7, depo. p. 15, 21; Doc. No. 73-2, depo. p. 70; Doc. No. 73-5, depo. p. 51–52). Employees that were not billing their hours to a specific contract/project/client were billing their hours to overhead, and those employees' hours were not being "utilized" towards a specific project. (Doc. No. 73-7, depo. p. 15; Doc. No. 73-2, depo. p. 70; Doc. No. 73-5, depo. p. 51–52). Thus, Robert and Forst told Chesser that based on their projected workload analysis, Chesser had ten to twelve too many employees within his region, and they also discussed this excess in terms of overhead dollars that needed to be reduced. (Doc. No. 73-7, depo. p. 42–45, 54; Doc. No. 73-6, depo. p. 22–23; Doc. No. 73-5, depo. p. 28).

### C.  The Selection of Employees to be Terminated in the RIF

Robert and Forst did not tell Chesser which employees to select for termination from the Tampa Transportation division in the RIF. (Doc. No. 73-7, depo. p. 45; Doc. No. 73-6, depo. p. 24; Doc. No. 73-5, depo. p. 29). Instead, Chesser discussed the matter with Dixon in May of 2015. (Doc. No. 73-7, depo. p. 49; Doc. No. 73-2, depo. p. 66–67). Chesser told Dixon to select people to terminate in order to reduce overhead; the remaining employees' utilization would be increased as they would absorb the work left by the terminated employees. (Doc. No. 73-2, depo. p. 73–75).

In determining the employees to be selected for termination, Dixon considered what the termination would do to the company's bottom line, what it would do to the company's capabilities, and whether any employees were performing better than others. (Doc. No. 73-2,

depo. p. 96). Dixon was not told to select people based on their age, and he contends that age had nothing to do with his selection of people to terminate in the RIF. (Doc. No. 73-2, depo. p. 83, 85–86; Doc. No. 18-2, ¶ 6).

### 1. Plaintiff Bradley Jones

At the time of the RIF, Bradley Jones, 53 years old, was a Designer IV/Technician in the traffic design subgroup of the Tampa Transportation division. He was one of three employees in that subgroup. The traffic design subgroup did plans for four types of work: (1) signalization, (2) signing and pavement marking, (3) lighting, and (4) Intelligent Transportation System ("ITS"). (Doc. No. 73-3, depo. p. 68–69). Jones was a senior designer for two types of plans–(1) signalization, and (2) signing and pavement marking. (Doc. No. 73-2, depo. p. 164). While working for Defendant, Jones did not do plans for the other two areas. (Doc. No. 73-2, depo. p. 164; Doc. No. 73-6, depo. p. 33).

Dixon selected Jones for termination in the RIF, rather than Jeremy Leuschke (age 34, who had less experience than Jones and whom Jones had helped train) or Anu Weerasuriya (age 50, who had been hired the year before the RIF). (Doc. No. 73-2, depo. p. 176–77, 219; Doc. No. 73-3, depo. p. 51; Doc. No. 75-1, depo. p. 6, 32–33; Doc. No. 76-3, p. 2). Dixon selected Jones for termination because there would not be a loss of capabilities by terminating him—the remaining people could do more things than Jones could. (Doc. No. 73-2, depo. p. 185, 193). Specifically, Leuschke and Weerasuriya were Professional Engineers; Jones was not. (Doc. No. 73-6, depo. p. 33–34). Therefore, they (and not Jones) could sign and seal engineering documents and perform quality control reviews. (Doc. No. 73-2, depo. p. 183, 185; Doc. No. 73-5, depo. p. 36). Additionally, Leuschke and Weerasuriya had done lighting and ITS work for

Defendant, which Jones did not do.  (Doc. No. 73-2, depo. p. 183).  Leuschke had done signalization and signing and pavement marking work prior to the RIF, so he could do all four types of work that the subgroup did.  (Doc. No. 73-2, depo. p. 184).

After Jones was terminated, his work was mostly absorbed by Leuschke (who was 34 years old at the time of the RIF).  (Doc. No. 73-2, depo. p. 189; Doc. No. 75-1, depo. p. 6).  Some employees in the roadway subgroup were also cross-trained to help absorb Jones' work.  (Doc. No. 73-2, depo. p. 189).

When Dixon's deposition was taken in December of 2017, the traffic design subgroup had three people: (1) Weerasuriya, (2) Chowdury Haider, and (3) Soufani.  (Doc. No. 73-2, depo. p. 216).  Haider and Soufani were both hired in late 2016; both are engineers.  (Doc. No. 73-2, depo. p. 216–17).

After Jones' termination but before Haider and Soufani were hired, Defendant had hired Arosha DeSilva into the traffic design subgroup; she was also an engineer.  (Doc. No. 73-2, depo. p. 219).  She was hired in late 2016, but she resigned.  (Doc. No. 73-2, depo. p. 219–20).

## 2.  Plaintiff Paula Taylor

At the time of the RIF, Paula Taylor, 52 years old, was one of two administrative assistants ("AA") within the Transportation division in Tampa.  (Doc. No. 73-2, depo. p. 98).  The other AA was Laura Self, who was 40 years old at the time of the RIF.  (Doc. No. 73-2, depo. p. 98; Doc. No. 61-9, depo. p. 14).   Taylor was part of the PD&E subgroup, and Self was a part of the roadway and drainage subgroups.  (Doc. No. 73-4, depo. p. 116–17, 189; Doc. No. 73-8, depo. p. 17).  According to Dixon, there was not enough work to keep both Taylor and Self, as

they both only had enough work to fill up 50–60% of their time in 2014 and 2015.[2]  (Doc. No. 73-2, depo. p. 98, 109).

Dixon stated that he selected Taylor for termination because Self had some capabilities that Taylor did not have.  (Doc. No. 73-2, depo. p. 98).  Specifically, Dixon stated that Self had more interaction with the company's clients.  (Doc. No. 73-2, depo. p. 112–13).  Additionally, Self had used the Electronic Review Comments ("ERC") system, which is a web-based program utilized by the FDOT; Taylor had not used the ERC system as much as Self.  (Doc. No. 73-2, depo. p. 98; Doc. No. 73-4, depo. p. 118–19).  Also, Self knew how to use the Project Solve system, a web-based program, that Taylor did not know how to use because the PD&E group that Taylor worked for did not use that program.  (Doc. No. 73-2, depo. p. 98–99; Doc. No. 73-4, depo. p. 117).  Self also knew how to use Projectwise, a system that allows global file sharing, which Taylor did not know how to use.  (Doc. No. 73-2, depo. p. 98–99; Doc. No. 73-4, depo. p. 117).

Dixon believed that both Self and Taylor were equally qualified, except that Self had experience with the systems described above that Taylor did not have.  (Doc. No. 73-2, depo. p. 101).  Additionally, Self had experience with the submittal process, which Taylor did not have due to her work in the PD&E subgroup.  (Doc. No. 73-2, depo. p. 113).  When asked about their performance, Dixon stated that both Self and Taylor did a good job.  (Doc. No. 73-2, depo. p. 107).  However, Dixon noted that on one occasion, he had an issue with Self being on the internet instead of doing work.  (Doc. No. 73-2, depo. p. 108, 111).

_____

[2]There was another AA and a receptionist in the Tampa office, but they were not in the Transportation division, so they were not considered for termination in the RIF.  (Doc. No. 73-2, depo. p. 106, 128).

Dixon selected Taylor for termination in the RIF. Dixon told Taylor that she was being terminated due to a lack of work. (Doc. No. 73-2, depo. p. 125). Self took over Taylor's duties after the RIF. (Doc. No. 73-2, depo. p. 124). When Dixon's deposition was taken in December of 2017, no one had been hired as an AA in the Tampa Transportation division since Taylor's termination. (Doc. No. 73-2, depo. p. 219).

### 3. Plaintiff Hamid Ashtari

At the time of the RIF, Hamid Ashtari, 56 years old, was an Engineer IV in the drainage subgroup in the Tampa Transportation division. He had seven other co-workers in that subgroup, and Dixon terminated two people from that subgroup. Specifically, Dixon selected Ashtari and Jason Dunn (age 37) for termination in the RIF; however, Dixon stated that they were both very good engineers. (Doc. No. 73-2, depo. p. 151–52).

Dixon selected Ashtari for termination for two main reasons. First, Ashtari was the only employee in that subgroup that had clients that had stated that they did not want to work with him. (Doc. No. 73-2, depo. p. 133, 141). Specifically, Dixon stated that two clients—District 7 and Turnpike—had stated that they did not want to work with Ashtari. (Doc. No. 73-2, depo. p. 133–140). Dixon admitted Turnpike's issue with Ashtari began more than ten years before the RIF, but the client did not want Ashtari working on any Turnpike projects. (Doc. No. 73-2, depo. p. 138–39, 161; Doc. No. 73-1, depo. p. 78–82). Likewise, Dixon stated that District 7's issue with Ashtari began more than fifteen years before the RIF. (Doc. No. 73-2, depo. p. 139, 158). Dixon admitted that he did not believe that Ashtari was at fault with regards to District 7, but the client did not want Ashtari working on any of its projects. (Doc. No. 73-2, depo. p. 139–40). However, Ashtari still worked on District 7 and Turnpike projects after the incidents that caused

these clients to request that he no longer work on their projects.  (Doc. No. 73-2, depo. p. 159–61).

Second, Dixon stated that Ashtari failed to follow standard operating procedures ("SOPs") for quality control the year prior to the RIF.  (Doc. No. 73-2, depo. p. 141–42, 146–49). In March of 2015, Ashtari was given a written reprimand for this incident (which states that it covers the period between November 2014 and February 2015), which was signed by Dixon. (Doc. No. 73-1, p. 219–21).

After Ashtari was terminated, his work was absorbed by the remaining people in his subgroup.  (Doc. No. 73-2, depo. p. 155).  Ashtari contends that Frank Muir, who was an intern for Defendant while finishing his engineering degree at the time of the RIF, was hired by Defendant a few months after the RIF.  (Doc. No. 73-1, depo. p. 68, 178–79).  Muir was in his mid-twenties at the time.  (Doc. No. 76-4, p. 4).

**D.  The Process After Dixon Selected People to be Terminated**

Once Dixon selected the people to be terminated in the RIF, he gave the list of people to Chesser.  (Doc. No. 73-5, depo. p. 37).  Chesser then discussed the list with Robert and Forst to ensure that the people on the list came from the groups that needed to be reduced based on the forecasted workload.  (Doc. No. 73-5, depo. p. 37–38; Doc. No. 73-6, depo. p. 47; Doc. No. 73-7, depo. p. 56).  Thereafter, the list was forwarded to Human Resources, and the selected employees were terminated.  (Doc. No. 73-5, depo. p. 39; Doc. No. 73-7, depo. p. 58).

**E.  The EEOC**

After Jones was terminated, he filed a charge of age discrimination with the EEOC. (Doc. No. 16-3).  The EEOC investigated Jones' charge and discovered that during the June 2015

RIF, Defendant terminated twenty-three employees nationwide, twenty-one of which were over 40 years old (the other two were 31 and 37 years old). (Doc. No. 73-2. p. 275, 277). Of those twenty-three people, Plaintiffs were three of seven individuals terminated from the Tampa Transportation division. Five of these seven Tampa employees terminated during the RIF were over 40 years old, and Dixon selected all seven of them for termination.

The EEOC asked Defendant about the specific criteria used to select Jones for termination, and Defendant responded with a document that was created partially before the RIF and partially after. (Doc. No. 73-2, depo. p. 213; Doc. No. 73-2, p. 279–280). The response included an eight-month forecasted workload for the traffic design subgroup that showed that less than 3 employees were needed for the forecasted period; this forecast was created prior to the RIF. (Doc. No. 73-2, depo. p. 213; Doc. No. 73-2, p. 279–280). The response included a written explanation of how the forecast was used—the forecast showed that one person needed to be terminated from the subgroup and that Jones was selected because, based on his capabilities, his selection would cause the least impact on the subgroup. (Doc. No. 73-2, p. 279–280). However, the forecast showed that eight months out (January 2016), Defendant's projected workload was expected to require 2.8 employees. (Doc. No. 73-2, p. 279–280; Doc .No. 73-2, depo. p. 215).

### F. This Lawsuit

On January 6, 2017, Jones filed the instant collective action against Defendant, alleging that his selection for the RIF was a result of age discrimination. Taylor and Ashtari opted into the collective action.

Plaintiffs contend that they were selected for termination due to their age, noting that twenty-one of the twenty-three people terminated in the RIF nationwide were over 40 years old,

and five of the seven employees terminated from the Tampa Transportation division were over

40.  Plaintiffs point to the following evidence to support their contention that they were selected

for the RIF due to their age.[3]

### 1.  No Need for a RIF

Plaintiffs contend that Defendant's own records and witness testimony do not support its

"lack of work" justification for the RIF; instead, the RIF was an excuse to terminate older

employees.  As an example, Plaintiffs point to the workload projection that Defendant submitted

to the EEOC in defense of Jones' claim, which showed that only .9 employees were needed in

May of 2015 to do 120 hours of work for the traffic subgroup.  However, at that time, there were

three people in that subgroup, and Jones, himself, had worked 182.5 hours in May of 2015.

(Doc. No. 76-6).

Plaintiffs argue that Defendant used the "lack of work" excuse when terminating Steve

Armstrong in 2012 when he was over 40 years old.  (Doc. No. 73-2, depo. p. 169–73).  Yet,

Defendant brought Armstrong back as a contractor to help Defendant with its workload, and he

was still working as a contractor for Defendant at the time of the 2015 RIF.  (Doc. No. 73-2,

depo. p. 169–73; Doc. No. 73-3, depo. p. 46–47).

Plaintiffs also point out that on Dixon's March 2016 performance appraisal, Defendant

noted two things: (1) that it had achieved 200% of its sales goal, totaling $24 million, and (2) the

Tampa Transportation division was on track to achieve over $10 million in gross revenue when

the goal was less than $8 million.  (Doc. No. 73-5, p. 122).  Taylor also contends that Jim

---

[3]The Court will address Plaintiffs' evidence that supports their arguments that
Defendant's reasons for selecting them for termination was pretextual later in this order.

Mykytka, a stockholder, told her that there was a $24 million backlog of work at the time of the RIF. (Doc. No. 73-4, depo. p. 158–59).

Finally, as of Dixon's December 2017 deposition, Defendant had more employees at its Tampa office than it had prior to the RIF. (Doc. No. 73-2, depo. p. 64). As of Chesser's December 2017 deposition, Defendant had more employees in his region for the Transportation division than it had prior to the RIF. (Doc. No. 73-5, depo. p. 18).

### 2. Ageist Comments

Plaintiffs contend that Defendant's high-level managers made ageist comments that show Defendant's discriminatory intent against its older workers. Specifically, Jones contends that once, at some time between 2005 and 2010, he heard Chesser at a corporate staff meeting in Tampa say that "you, the young engineers of RS&H, are our future." (Doc. No. 73-3, depo. p. 150–53).

Additionally, Plaintiffs contend that a former supervisor in the Tampa office, Steve Armstrong, told Jones that Defendant was "looking to reduce staff, specifically the older personnel" when Defendant was implementing a RIF in 2012. (Doc. No. 73-3, depo. p. 130–39). Armstrong told Jones that he (Armstrong) had spoken with the then-president of the Tampa office (John DeBellis) and that DeBellis told Armstrong that Defendant was looking to target older employees.[4] (Doc. No. 73-3, depo. p. 130–39).

### 3. The Releases

Plaintiffs argue that Defendant attempted to hide its discriminatory intent by not complying with the Older Workers Benefit Protection Act ("OWBPA"). Specifically, Plaintiffs

---

[4]Taylor also contends that "somebody" once told her during the 2008/2009 time-frame that Defendant tries to get rid of people before they retire. (Doc. No. 73-4, depo. p. 202–03). The Court will not consider this hearsay statement that cannot be reduced to admissible form at trial, given that Taylor cannot remember who said the statement. (Doc. No. 73-4, depo. p. 203).

contend that when they were terminated, Defendant asked them to sign an Employment Transition Agreement that included releases of claims that they may have had against Defendant in exchange for extra severance pay. (Doc. No. 16-3; Doc. No. 73-1, depo. p. 108–09; Doc. No. 73-2, depo. p. 126). They contend that this agreement did not comply with several of OWBPA's requirements, including the requirement that Defendant provide Plaintiffs with the job titles and ages of all individuals that were offered this exit incentive, as well as the ages of all individuals in the same job classification or organizational unit who were not offered this exit incentive. 29 U.S.C. § 626(f). Plaintiffs contend that if Defendant had provided them with such information, it would have shown them that older people were being terminated in the RIF at a disproportionate rate.

## III.  Motion for Summary Judgment

In the instant motion, Defendant moves for summary judgment on Plaintiffs' age discrimination claims.[5]  Accordingly, the Court will analyze each plaintiff's age discrimination claim.

The Age Discrimination in Employment Act ("ADEA") prohibits terminating an employee that is at least forty years old "because of" their age.  See Ayala v. Sheriff, Broward County Florida, 594 F. App'x 602, 603 (11th Cir. 2015).  Thus, to prevail on their age discrimination claims, Plaintiffs must show that their age was the but-for cause for each of their

---

[5]Plaintiff Jones' complaint asserts two claims: (1) violation of the Age Discrimination in Employment Act ("ADEA") and (2) age discrimination in violation of the Florida Civil Rights Act ("FCRA").  (Doc. No. 1). Taylor and Ashtari opted into this case and joined with Jones on the ADEA claim.  As age discrimination claims under the ADEA and FCRA are analyzed using the same standards, the Court will not differentiate between these age discrimination claims.  See Ayala v. Sheriff, Broward County Florida, 594 F. App'x 602, 603 (11th Cir. 2015).

terminations.  See id.  Stated differently, Plaintiffs must show that Defendant terminated each of them because of their age; they must show that age was the reason that Defendant decided to act. See Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009).  To do this, each plaintiff must make out a prima facie case.  See Earley v. Champion International Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  In response, Defendant must provide a legitimate, non-discriminatory reason for each plaintiff's adverse employment action.  See id.  Thereafter, Plaintiffs must show that Defendant's proffered legitimate, non-discriminatory reasons are mere pretext for discrimination.  See id.

Plaintiffs may establish a prima facie case in one of three ways: direct evidence, circumstantial evidence using the McDonnell Douglas[6] framework, or statistical evidence.  See id.  Plaintiffs do not contend that they have direct evidence of discriminatory intent in this case;[7] instead, they use statistical and circumstantial evidence to support their claims.

**A.  Proving Discrimination by Using Statistical Evidence**

One way to prove discrimination is through statistical evidence.  However, statistics without an analytic foundation are virtually meaningless.  See Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 952 (11th Cir.1991).

In this case, Plaintiffs have provided expert testimony from Craig Moore, Ph.D. regarding

---

[6]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[7]Statements by non-decision-makers (such as Armstrong's statement three years before the RIF that Defendant was looking to target older employees when reducing staff), as well as statements by decision-makers that are not related to the decision-making process at issue (such as Chesser's statement years before the RIF that the young engineers were the future of RS&H) are not direct evidence of discrimination.  See Bradley v. Pfizer, Inc., 440 F. App'x 805, 808 (11th Cir. 2011).

Defendant's terminations during the June 2015 RIF. (Doc. No. 76-5). Moore based his analysis, in part, on the ages of the seven employees terminated from the Tampa Transportation division during the 2015 RIF. Moore compared that information to the ages and number of employees that were employed by Defendant in the Tampa division in August of 2016.[8] (Doc. No. 76-5, fn. 3; Doc. No. 76-3). However, such analysis is of little value because the proper comparison would be to compare: (1) the ages and number of employees that were terminated by Defendant from the Tampa Transportation division during the June 2015 RIF, to (2) the ages and number of employees that were employed by Defendant in the Tampa Transportation division *at the time of the June 2015 RIF* (not over a year later, in August of 2016). Stated differently, the Court cannot give much weight to the fact that five of the seven terminated employees were over forty without knowing the ages of the pool of employees from which these seven were selected (i.e., the ages of the employees that were employed by Defendant in the Tampa Transportation division at the time of the June 2015 RIF). See Pace v. Southern Railway System, 701 F.2d 1383, 1389 (11th Cir. 1983)(finding statistics—based on the fact that ten of the twelve demoted employees were over forty—to be flawed because there was no evidence regarding whether or not a substantial majority of the employee pool from which the twelve employees were selected were over forty).

Furthermore, even if this Court assumed that Plaintiffs' proffered statistics showed that Defendant sometimes discriminates based on age, those statistics are not sufficient evidence that

_____

[8]It is unclear whether the list of employees Moore considered for the current employees as of August 2016 consisted of employees within all of the Tampa division or just the employees within the Tampa Transportation division, because the list is titled, "Current Employees - Tampa Division (August 2016)." (Doc. No. 76-3). To the extent that the list consisted of employees within all of the Tampa division, this is another flaw in the analytic foundation.

Defendant did so with respect to Plaintiffs.  See Krieg v. Paul Revere Life Ins. Co., 718 F.2d 998, 1002 (11th Cir. 1983).  This is because the statistics do not negate the reasons given by Defendant for Plaintiffs' terminations—that Plaintiffs were terminated due to a RIF and that Plaintiffs were selected because their terminations would cause the least negative impact on Defendant's capabilities to perform its work.  See id.  Therefore, the Court will evaluate Plaintiffs' claims under the McDonnell Douglas framework for analyzing circumstantial evidence.

**B.  Proving a Prima Facie Case by Using Circumstantial Evidence**

The McDonnell Douglas framework for analyzing circumstantial evidence when the terminations are part of a RIF is somewhat different than when an employee asserts an age discrimination claim in a non-RIF setting.  In order for Plaintiffs to establish a prima facie case in a RIF setting, they each must show the following: (1) they were in a protected age group and adversely affected by an employment decision; (2) they were qualified for their current position or to assume another available[9] position at the time of their termination; and (3) evidence by which a fact-finder might reasonably conclude that the employer intended to discriminate on the basis of age in making the employment decision.  See Earley, 907 F.2d at 1082.

With regard to the third element, a plaintiff must produce some evidence that the employer did not treat age neutrally, but instead, the employer discriminated based on age.  See Williams v. General Motors Corp., 656 F.2d 120, 129–30 (5th Cir. 1981).  "Specifically, the evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously

---

[9]Pointing to job openings that became available several months after a plaintiff's discharge is not sufficient to meet the second element.  See Earley, 907 F.2d at 1083.

refused to consider retaining or relocating a plaintiff because of his age, or (2) defendant regarded age as a negative factor in such consideration." Id. at 130.

The parties do not dispute that Plaintiffs meet the first element—they are each over forty and were terminated from their positions.[10]  Instead, the parties dispute the second and third elements.  Accordingly, the Court will analyze whether each plaintiff can establish a prima facie case.

### 1.  Jones' Claims

Plaintiff Jones' position of Designer IV/Technician was completely eliminated from the traffic design subgroup of the Tampa Transportation division.  Defendant contends that when a position is completely eliminated, the second element of the prima facie case is modified. Specifically, when "a particular job position is entirely eliminated for non-discriminatory reasons," the plaintiff "must show that he was qualified for another available job with that employer; qualification for his current position is not enough."  See Earley, 907 F.2d at 1082–83. Since Jones does not identify another available job for which he was qualified, Defendant argues that Jones cannot satisfy the second element.

Plaintiff responds by pointing out that the modified approach only applies when a  job position is entirely eliminated *for non-discriminatory reasons*.[11]  Since Jones is challenging whether the RIF was instituted in order to hide Defendant's intent to terminate older employees,

---

[10]To the extent that Defendant argues that the decision-makers did not know Plaintiffs' actual ages (Jones was 53, Taylor was 52, and Ashtari was 56), Plaintiffs respond that the decision-makers knew Plaintiffs and could easily discern that they were over 40 years old.

[11]An example of a position being eliminated for non-discriminatory reasons would be if a position is eliminated in order to transfer the duties to a computerized process.  See Earley, 907 F.2d at 1083.

and since he is also challenging whether his selection for the RIF—which led to his position being entirely eliminated—was made based on his age, he argues that the modified approach does not apply. The Court is persuaded by this argument. If the modified approach does not apply, as this Court finds, then Jones meets the second element, as the evidence before the Court shows that he was qualified for his current position.

With regard to the third element—evidence by which a fact-finder might reasonably conclude that Defendant intended to discriminate on the basis of age in making the decision to select Jones for termination—the evidence as to this element is somewhat weak. Jones points to the fact that his work was mostly absorbed by Leuschke, who was 34 years old at the time of the RIF. Furthermore, Jones points to the fact that twenty-one of the twenty-three people terminated during the June 2015 RIF were over 40 years old, and five of the seven employees terminated in the Tampa Transportation division were over 40.[12] Thus, Jones contends that this shows Defendant's intention to have younger employees perform its work.[13] Jones points to other evidence which goes to disputing Defendant's proffered reasons for the RIF and his selection for termination (which the Court will address later in this order), so the Court will assume that Jones

_____

[12]Again, the Court reiterates that this statistical evidence should not be given much weight due to the lack of foundation for the analysis.

[13]In a non-RIF setting, a plaintiff may meet the element that they were replaced by a younger person by showing that their duties were delegated to a younger employee. See Mazzeo v. Color Resolutions International, LLC, 746 F.3d 1264, 1271 (11th Cir. 2014). While that element is not a part of a prima facie case in a RIF setting—likely because terminated employees' duties would usually be absorbed by the remaining (and sometimes younger) employees—the Court will consider such evidence as part of Plaintiffs' prima facie case for two reasons. First, the Court finds that Plaintiffs' claims ultimately fail at the pretext stage of the analysis. Second, the McDonnell Douglas framework is not the sole way for a plaintiff to survive summary judgment based on circumstantial evidence in a discrimination case. Sims v. MVM, Inc., 704 F.3d 1327, 1333 (11th Cir. 2013).

18

can establish a prima facie case.

### 2.  Taylor's Claim

Plaintiff Taylor's position as an AA in the PD&E subgroup was completely eliminated, but as explained above with respect to Jones' prima facie case, the Court finds that Taylor can meet the second element by showing that she was qualified for her current position.  There is sufficient evidence before the Court for the Court to find that she was qualified.

With regard to the third element, Taylor points to the fact that her work was mostly absorbed by Self, an AA who was 40 years old at the time (and thirteen years younger than Taylor).  The fact that Self was also in the protected class does not cause Taylor's claim to fail.  What must be shown, however, is that Taylor was terminated and Self was retained due to their ages.  See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996).  Again, like Jones' claims, the Court will assume that Taylor can establish a prima facie case of age discrimination.  See Jones v. BE&K Engineering Co., 146 F. App'x 356, 359 (11th Cir. 2005)(finding that the third element was met when the plaintiff showed that he was doing the same work as another younger employee who absorbed the plaintiff's work after the RIF).

### 3.  Ashtari's Claim

Plaintiff Ashtari's position as an engineer in the drainage subgroup was not completely eliminated, and the evidence before the Court shows that he was qualified for his position.  Thus, the Court finds that he can meet the second element.

With regard to the third element, Ashtari argues that Muir, who was 26 years old at the time and less qualified, was hired a few months after the RIF.  However, it is not clear exactly when Muir was hired and/or whether he was hired to assume Ashtari's work.  Instead, there is

evidence before the Court that Ashtari's duties were absorbed by his subgroup. (Doc. No. 73-2, depo. p. 155). The Court is not privy to the ages of the people remaining in Ashtari's subgroup at the time of the RIF, so it is possible that his work was absorbed by younger employees.

Ashtari also relies on the same weak statistical evidence regarding the fact that twenty-one of the twenty-three people terminated during the June 2015 RIF were over 40 years old, and five of the seven employees terminated in the Tampa Transportation division were over 40. Ashtari also points to other evidence which goes to disputing Defendant's proffered reasons for the RIF and his selection for termination (which the Court will address later in this order), so the Court will assume that Ashtari can establish a prima facie case.

### C. Legitimate Non-Discriminatory Reasons

Since Plaintiffs have each offered evidence to support their prima facie case, Defendant must provide a legitimate, non-discriminatory reason for each plaintiff's adverse employment action. The Court finds that Defendant has done so.

Defendant has proffered evidence that based on the company's workload projections, it determined that a RIF was necessary for the Transportation division. Even Taylor acknowledged that there were a lot of proposals going out but not a lot of proposals being won by Defendant. (Doc. No. 73-4, depo. p. 121–22). Additionally, Robert stated in her deposition that in the six months prior to the RIF, the Transportation division had lost $750,000 in profit, and in the six months after the RIF, the Transportation division was positive $350,000 in profit. (Doc. No. 73-7, depo. p. 70–71).

Furthermore, Defendant has explained why each plaintiff was selected for termination in the RIF. Dixon selected employees whose terminations would cause the least negative impact on

20

the company's capabilities, as explained below.

### 1. Jones

Defendant contends that Dixon selected Jones for termination in the RIF because there would not be a loss of capabilities by terminating him—the people remaining in his subgroup (Leuschke and Weerasuriya) could do more things than Jones could.  Specifically, Leuschke and Weerasuriya were Professional Engineers; Jones was not.  Therefore, they (and not Jones) could sign and seal engineering documents and perform quality control reviews.  Additionally, Leuschke and Weerasuriya had done lighting and ITS work for Defendant, which Jones did not do.  Leuschke had done signalization and signing and pavement marking work prior to the RIF, so he could do all four types of work that the subgroup did.  (Doc. No. 73-2, depo. p. 184).

### 2. Taylor

Defendant contends that Dixon selected Taylor for termination because Self had some capabilities that Taylor did not have.  Specifically, Dixon stated that Self had more interaction with the company's clients. Additionally, Self had used the ERC system, which is a web-based program utilized by the FDOT; Taylor had not used the ERC system as much as Self.  Also, Self knew how to use the Project Solve system, a web-based program, that Taylor did not know how to use because the PD&E group that Taylor worked for did not use that program. Self also knew how to use Projectwise, a system that allows global file sharing, which Taylor did not know how to use.  Finally, Self had experience with the submittal process, which Taylor did not have due to her work in the PD&E subgroup.  Self had experience doing all of the duties that Taylor had done, and Self did not require any additional skills to do Taylor's work.  (Doc. No. 73-8, depo. p. 19–20).

### 3. Ashtari

Defendant contends that Dixon selected Ashtari for termination for two main reasons. First, Ashtari was the only employee in that subgroup that had clients that had stated that they did not want to work with him (District 7 and Turnpike). Second, Dixon stated that Ashtari failed to follow SOPs for quality control the year prior to the RIF.

### D. Pretext

Since Defendant has proffered legitimate, non-discriminatory reasons for each plaintiff's termination, Plaintiffs must point to evidence that shows that Defendant's proffered reasons are mere pretext for discrimination. The Eleventh Circuit has been very clear regarding how pretext can be shown:

> To demonstrate pretext, the plaintiff must show both that the employer's proffered reason is false, and that discrimination was the real reason. The plaintiff must meet the employer's reason head on and rebut it, and may not simply quarrel with the wisdom of the reason. He may do this either directly by establishing that a discriminatory reason more likely than not motivated the employer, or indirectly by showing that the proffered reason is unworthy of credence. Under the latter approach, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason that a reasonable factfinder could conclude that it is unworthy of credit.
>
> [Courts] are not in the business of adjudging whether employment decisions are prudent or fair, and are solely concerned with whether unlawful discriminatory animus motivate[d] a challenged employment decision. [Courts] do not sit as a super-personnel department that reexamines an entity's business decisions. The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.

Mitchell v. City of LaFayette, 504 F. App'x 867, 870–71 (11th Cir. 2013)(internal citations and quotation marks omitted). Furthermore:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). Thus, the court's inquiry "is limited to whether the employer gave an honest explanation of its behavior." Id. (quotation marks and citations omitted). Accordingly, the Court will analyze Plaintiffs' evidence of pretext below.

### 1. Need for a RIF

Plaintiffs first argue that Defendant's proffered reason for their terminations—that based on the company's workload projections, it determined that a RIF was necessary for the Transportation division—is mere pretext. They contend that Defendant's own records and witness testimony do not support its "lack of work" justification for the RIF; instead, the RIF was an excuse to terminate older employees. As an example, Plaintiffs point to the workload projection that Defendant submitted to the EEOC in defense of Jones' claim, which showed that only .9 employees were needed in May of 2015 to do 120 hours of work for the traffic subgroup. However, at that time, there were three people in that subgroup, and Jones, himself, had worked 182.5 hours in May of 2015.[14]

_____

[14]Plaintiffs also point out that there are two different workload projections that cover the same period but which indicate a need for a different number of employees each month. (Doc. No. 73-2, p. 279, 325–26). Specifically, the workload projection that was created in response to the EEOC's inquiry on Jones' claim indicated that the following number of employees were needed in 2015–2016: 0.9 in May 2015, 1.9 in June, 1.0 in July, 1.4 in August, 1.5 in September, 2.1 in October, 2.4 in November, 2.3 in December, and 2.8 in January 2016. (Doc. No. 73-2, p. 279). However, the other workload projection indicated that less than 1.2 employees were needed between May and September 2015, and less than 0.4 employees were needed between

Plaintiffs argue that Defendant used the "lack of work" excuse when terminating Steve Armstrong in 2012 when he was over 40 years old. Yet, Defendant brought him back as a contractor to help Defendant with its workload, and he was still working as a contractor for Defendant at the time of the 2015 RIF.

Plaintiffs also point out that on Dixon's March 2016 performance appraisal, Defendant noted two things: (1) that it had achieved 200% of its sales goal, totaling $24 million, and (2) the Tampa Transportation division was on track to achieve over $10 million in gross revenue when the goal was less than $8 million. (Doc. No. 73-5, p. 122). Taylor also contends that Jim Mykytka, a stockholder, told her that there was a $24 million backlog of work at the time of the RIF. (Doc. No. 73-4, depo. p. 158–59).

Additionally, Plaintiffs point out that as of Dixon's December 2017 deposition, Defendant had more employees at its Tampa office than prior to the RIF. (Doc. No. 73-2, depo. p. 64). As of Chesser's December 2017 deposition, Defendant had more employees in his region of the Transportation division than prior to the RIF. (Doc. No. 73-5, depo. p. 18).

This evidence, however, does not raise a genuine issue of material fact that the RIF was an excuse to terminate older employees for several reasons. First, the fact that Jones worked 182.5 hours in May of 2015 when the workload projections showed that only 120 hours of work would be available for the three people in that subgroup may show that Defendant's May projection was not accurate. However, workload projections may not always be perfect, but Plaintiffs do not offer evidence that Defendant and the decision-makers did not honestly rely on

_____

October 2015 and January 2016. (Doc. No. 73-2, p. 325–26). However, neither of these projections show a need for three full-time employees for the 2015–2016 period.

these workload projections, even if they were inaccurate.  As explained by the Eleventh Circuit:

> A plaintiff trying to show pretext based on a defendant's dishonest belief of the grounds the defendant gave for his decision does not succeed by presenting evidence that the defendant was mistaken about the facts upon which he based his alleged non-discriminatory decision. Instead, a plaintiff must present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which he allegedly based his non-discriminatory decision.

Woodard v. Fanboy, L.L.C., 298 F.3d 1261, 1265 (11th Cir. 2002).

Second, the fact that Defendant terminated Armstrong when he was over 40 years old due to an alleged lack of work and then brought him back as a contractor is not evidence of discriminatory animus.  Like Jones' overtime work during May 2015, Armstrong's termination and return as a contractor may only show that Defendant's forecasts were not perfect.  Furthermore, Plaintiffs have not proffered evidence regarding how much work Armstrong was brought back to do for Defendant (i.e., whether Armstrong was consistently working 40-hours per week for Defendant or whether he was working a few hours when needed).  When Robert was asked whether she could compare Defendant's actual workload versus projected workload to see how accurate the projections were, she responded: "I don't think that that would be an indication of how accurate the projections were at the point in time that those projections were made because information changes consistently."  (Doc. No. 73-7, depo. p. 103).

Third, the fact that Dixon's March 2016 performance appraisal showed that Defendant had achieved 200% of its sales goal and was on track to achieve over $10 million in gross revenue and the fact that Taylor contends that she was told that there was a $24 million backlog of work at the time of the RIF does not show that the RIF was unnecessary or pretextual.  Taylor

acknowledges that the $24 million backlog of work may have been company-wide and not specifically for the Transportation division. (Doc. No. 73-4, depo. p. 120, 159). However, the RIF targeted the Transportation division, not the company as a whole.[15] See Beaver v. Rayonier, Inc., 200 F.3d 723, 728 (11th Cir. 1999)(stating that the plaintiff's evidence of profitability of the company as a whole, as opposed to profitability of the mill impacted by the RIF, was irrelevant to the issue of whether economic conditions at the mill led to the RIF). Furthermore, the fact that as of March 2016, the company's sales and gross revenue were exceeding expectations does not, in itself, undercut Defendant's assertion that as of June 2015, it believed that its workload projections necessitated a RIF.

Fourth, the fact that as of December 2017, Defendant had more employees at its Tampa office than prior to the RIF and/or that Chesser had more employees in his region for the Transportation division than prior to the RIF is not evidence that the June 2015 RIF was unnecessary. Comparing the number of the company's employees at the time of the RIF and a year-and-a-half later does not reveal anything about the workload projections at the time of the RIF. Furthermore, Plaintiffs provide no detail regarding what position each added employee held, when each employee was added, or the ages of the additional employees. See id. (rejecting the plaintiff's argument that the company's hiring of additional employees at the time of the RIF showed that the RIF was pretextual, because the plaintiff did not produce evidence that the additional employees' positions were similarly situated to those eliminated in the RIF).

If a company gets more work and increases its workload projections, a company may

---

[15]The RIF also targeted the Aerospace division, but not the company as a whole. (Doc. No. 73-9, depo. p. 49–50).

reasonably be expected to hire more employees.  However, a company is not required to keep its current number of employees when its workload does not support such staffing in hopes that more work comes along.  "[T]he essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired." Earley, 907 F.2d at 1083 (quotation marks and citation omitted).

Plaintiffs also take issue with the fact that during their monthly staff meetings where they discussed their projected sales, the need for a RIF or that the Transportation division was not doing well was never brought up.  (Doc. No. 73-3, depo. p. 114–15; Doc. No. 73-1, depo. p. 177–78).  At these monthly meetings, Dixon would give a summary regarding how the Transportation division was doing.  (Doc. No. 73-1, depo. p. 178).  However, the decision to have a RIF was made at a higher level than Dixon, so his failure to discuss the need for a RIF does not show that Defendant did not believe that a RIF was needed.

Plaintiffs also argue that Defendant and its witnesses gave contradictory reasons for the RIF.  Plaintiffs argue that Defendant stated that a RIF was needed due to a lack of work, while Forst and Dixon stated that the purpose of the RIF was to increase utilization and reduce overhead, with the work of the terminated employees being absorbed by the remaining employees.  However, these reasons are not contradictory at all.  Because of a lack of work, employees were charging some of their time to projects and some of their time to overhead. When Defendant reduced the number of employees, the remaining employees absorbed the terminated employees' work, which would lead to a higher utilization rate for the remaining employees and lower overhead.

Plaintiffs also argue that over the years, they had observed Defendant engaging in a

pattern of terminating older employees and replacing them with younger employees once the younger employees were trained. (Doc. No. 16-3, ¶ 10; Doc. No. 16-4, ¶ 9; Doc. No. 16-5, ¶ 9). When asked to provide names and the circumstances surrounding such employees' terminations, Jones could only come up with three names[16], stating that he could recognize the names of others if he had a list of Defendant's employees. (Doc. No. 73-3, depo. p. 117–25, 213–16). Jones acknowledged, however, that he did not know why these employees were terminated, who was the decision-maker for each termination, or anything about the circumstances of their terminations. (Doc. No. 73-3, depo. p. 124–25). Jones stated that people are generally aware of what is going on in the Tampa office, and he was unaware of any performance issues with the people he contends were terminated based on their age. (Doc. No. 73-3, depo. p. 213–16). Likewise, Taylor could identify people that she contends were terminated based on their age[17], but she also acknowledged that some of them may have been terminated due to lack of work. (Doc. No. 73-4, depo. p. 81–115, 161–69).

Ashtari stated that when he thought about all of the people that Defendant had terminated over the years, he could remember many older employees but no younger employees that were terminated. (Doc. No. 73-1, depo. p. 118). However, Ashtari could only name three older employees that were terminated, and he did not know the details surrounding their terminations.[18] (Doc. No. 73-1, depo. p. 117–25). The only specific evidence Ashtari proffered was that when

---

[16]Richard Gasparin, Rose Gasparin, and Alan Cabrera.

[17]Julie Holmes, Louise Ellrod, Woody Moore, Elsie Lewis, Rich Gasparin, Rose Gasparin, Tim Deurling, and Tom Kelly.

[18]Rich Gasparin, Rose Gasparin, and Jim Goodwin.

one older employee (Jim Goodwin) was terminated in 2012, a younger employee (Brett Bennett) absorbed some or all of his work. (Doc. No. 73-1, depo. p. 117–25).

These vague and conclusory statements and evidence proffered by Plaintiffs are not sufficient to show a pattern of age discrimination, because they simply identify older employees who were terminated. More information than what was provided by Plaintiffs is necessary to create an issue of fact regarding a pattern of age discrimination or that the RIF was a vehicle used to disguise age discrimination.

Plaintiffs cannot merely dispute the necessity of the RIF; instead, they must show that Defendant did not honestly believe that a RIF was needed based on its workload projections. The evidence above does not create a genuine issue of material fact regarding whether Defendant honestly believed that having a RIF was the correct financial move for the company. After considering the evidence set forth above, as well as: (1) the evidence that five of the seven employees from the Tampa Transportation division that were terminated in the RIF were over 40 years old; (2) the evidence from Jones that two high-level managers made ageist comments years before the RIF;[19] and (3) Plaintiffs' contention that Defendant failed to comply with the OWBPA

---

[19]Jones contends that once, at some time between 2005 and 2010, he heard Chesser at a corporate staff meeting in Tampa say that "you, the young engineers of RS&H, are our future." Additionally, Plaintiffs contend that a former supervisor in the Tampa office, Steve Armstrong, told Jones that Defendant was "looking to reduce staff, specifically the older personnel" when Defendant was implementing a RIF in 2012. Armstrong told Jones that he (Armstrong) had spoken with the then-president of the Tampa office at the time (John DeBellis) and that DeBellis told Armstrong that Defendant was looking to target older employees. These two isolated comments made years before the RIF are not evidence of pretext. See Perry v. City of Avon Park, Florida, 662 F. App'x 831, 838 (11th Cir. 2016)(finding that the decision-maker's discriminatory remark made three years prior to the termination decision was not sufficient evidence of pretext); Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999)(stating that comments by a non-decision-maker do not raise an inference of discrimination).

(when it failed to provide Plaintiffs with the job titles and ages of all individuals that were offered the exit incentive of extra severance pay in return for signing a release of their claims, as well as the ages of all individuals in the same job classification or organizational unit who were not offered this exit incentive)[20] in order to disguise its true motive for the RIF, the Court concludes that Plaintiffs have not put forth sufficient evidence to create a genuine issue of material fact that terminating older employees was actually the true motivation for the RIF and/or that Defendant did not honestly believe that a RIF was needed based on its workload projections.

Assuming a RIF was necessary, Plaintiffs also challenge their selection for termination in the RIF. They contend that Defendant's proffered reasons for their selection are mere pretext. Therefore, the Court will analyze each plaintiff's argument of pretext with respect to their selection for termination.

## 2. Jones' Selection for Termination

Defendant's proffered reason for Jones' selection for termination is that there would not be a loss of capabilities by terminating him—the other two employees remaining in his subgroup (Leuschke - age 34; Weerasuriya - age 50) could do more things than Jones could because they were Professional Engineers; Jones was not. Therefore, they (and not Jones) could sign and seal engineering documents and perform quality control reviews. Additionally, Leuschke and Weerasuriya had done lighting and ITS work, which Jones did not do. Leuschke had done

---

[20]To the extent that Plaintiffs contend that Defendant's alleged failure to comply with the OWBPA results in a separate, compensable violation of the ADEA, the Court rejects their argument. The OWBPA does not create a separate cause of action under the ADEA. See Hearn v. International Business Machines, 2013 WL 5499610, at *7 (M.D. Fla. Oct. 1, 2013). Instead, it creates requirements that must be met in order for an employee's waiver of their ADEA claims to be valid and enforceable. See id.; Oubre v. Entergy Operations, Inc., 522 U.S. 422, 426–27 (1998). Plaintiffs, however, did not sign the agreement to waive their ADEA claims.

signalization and signing and pavement marking work prior to the RIF, so he could do all four types of work that the subgroup did.

Jones disputes Defendant's contention that he only had experience with two of the four types of work his subgroup did, arguing that Dixon did not actually know whether Jones could do all four types of work.  (Doc. No. 73-2, depo. p. 167).  Jones contends that he has prior experience (from employment before working for Defendant) in all four types of work, but he primarily worked for Defendant in just two areas because there was so much work in those areas.  (Doc. No. 73-3, depo. p. 30).  However, Jones does not point to any evidence that Dixon did not honestly believe that Jones did not have experience with all four types of work.  (Doc. No. 73-2, depo. p. 167–68).

Furthermore, even if Dixon knew that Jones could do all four types of work, that does not undermine the fact that Dixon chose to retain the two employees who could not only do all four types of work, but they were also Professional Engineers and could sign and seal engineering documents and perform quality control reviews (which Jones could not do).  Thus, Jones has failed to show that Defendant's proffered reason—that it selected Jones for termination because he was not a Professional Engineer—is pretext for discrimination.  See Jones, 146 F. App'x at 359 (finding no age discrimination when the defendant terminated the plaintiff-designer in favor of retaining the employee with an engineering degree, because the engineering degree made the engineer more valuable for the future needs of the company).

Jones contends that Defendant's capabilities would have been the same had it chose to retain Jones and terminate either Leuschke or Weerasuriya, because in such a situation, all four types of work could have been done and there would have been a Professional Engineer to sign

and seal engineering documents and perform quality control reviews. However, this does not

take into consideration that Defendant thought that having two Professional Engineers (rather

than one designer with engineering experience and one Professional Engineer) was better for the

company. This Court will not second guess the business decisions of Defendant regarding which

combination of retained employees was better for the company without some indication that age

was a factor in Defendant's decision. See Licausi v. Symantec Corp., 378 F. App'x 964, 967

(11th Cir. 2010)(stating that the court would not second guess the criteria that the company used

to compare employees considered for termination in the RIF); Godby v. Marsh USA, Inc., 346 F.

App'x 491, 494 (11th Cir. 2009)(stating that to the extent the plaintiff argued that other

employees would have been better choices for the RIF, the court would not second-guess the

business judgment of the defendant).

     Finally, to the extent that Jones argues that he has offered evidence of discriminatory

intent by providing evidence that Defendant hired a much younger entry-level engineer to replace

him, the Court rejects this argument. It appears that Jones is referring to Arosha DeSilva, who

was hired in late 2016.[21]  (Doc. No. 73-2, depo. p. 219–20). However, Defendant's hiring of a

younger person into Jones' former subgroup a year-and-a-half after the RIF is not evidence that

age motivated the decision to select Jones for termination, especially given the fact that DeSilva

was an engineer.

     Thus, based on the above, the Court finds that Jones has not created a genuine issue of

material fact regarding pretext. Considering all of the evidence described in this order, the Court

---

[21]Two other people were hired into Jones' former subgroup after DeSilva was hired.
However, like DeSilva (and unlike Jones), both of these people were engineers.

concludes that it does not create a convincing mosaic of circumstantial evidence that would allow a jury to find that age discrimination was the but-for cause of Jones' termination. Accordingly, the Court grants Defendant summary judgment on Jones' age discrimination claims.

### 3. Taylor's Selection for Termination

Defendant's proffered reason for selecting Taylor for termination is that Self had some capabilities that Taylor did not have, such as: more interaction with the company's clients, experience with the ERC system, experience with the Project Solve system, experience with the Projectwise system, and experience with the submittal process. While Taylor does not appear to dispute that she did not have as much experience with the ERC system, Project Solve system, or Projectwise system, she argues that Self did not use those systems that much and that she (Taylor) could have easily figured out how to use them. (Doc. No. 73-8, depo. p. 25–32; Doc. No. 73-4, depo. p. 117–18). In fact, Self had not used Projectwise for approximately three-and-a-half years prior to the RIF and has not used it since. (Doc. No. 73-8, depo. p. 25). While Self uses the ERC system and Project Solve system at least once per week, it took her less than a day to learn the Project Solve system and less than a week to learn the ERC system. (Doc. No. 73-8, depo. p. 28–29, 31).

Taylor argues that she should have been retained because she was the senior AA and had been with the company longer than anybody and knew more than anybody in the Tampa office. (Doc. No. 73-4, depo. p. 60). Furthermore, she trained Self. (Doc. No. 73-4, depo. p. 61). Thus, Taylor contends that she was selected for termination due to her age.

The Court rejects Taylor's argument that she has proffered sufficient evidence of pretext. Defendant was trying to cut costs and had to terminate one of two qualified AA's. Even

accepting Taylor's argument that she was more qualified than Self, her allegedly greater qualifications were not so extreme as to render the selection of Taylor for termination as evidence of age discrimination. The Court will not second guess the business decisions of Defendant regarding which AA should have been retained without some evidence that age was a factor in Defendant's decision. See Licausi, 378 F. App'x at 967 (stating that the court would not second guess the criteria that the company used to compare employees considered for termination in the RIF); Godby, 346 F. App'x at 494 (stating that to the extent the plaintiff argued that other employees would have been better choices for the RIF, the court would not second-guess the business judgment of the defendant). The evidence before the Court shows that Defendant was faced with the difficult decision of needing to terminate one of two qualified AA's, and it chose to terminate the one that had less experience with the submittal process and did not have experience using the ERC and Project Solve programs, which would be used weekly by the remaining AA.

Thus, based on the above, the Court finds that Taylor has not created a genuine issue of material fact regarding pretext. Considering all of the evidence described in this order, the Court concludes that it does not create a convincing mosaic of circumstantial evidence that would allow a jury to find that age discrimination was the but-for cause of Taylor's termination. Accordingly, the Court grants Defendant summary judgment on Taylor's age discrimination claim.

### 4. Ashtari's Selection for Termination

Defendant's proffered reasons for selecting Ashtari for termination are: (1) Ashtari was the only employee in that subgroup that had clients that had stated that they did not want to work with him (District 7 and Turnpike); and (2) Dixon stated that Ashtari failed to follow SOPs for

quality control the year prior to the RIF. In order to show pretext, Ashtari must show that both reasons given for his termination are pretextual. See Chapman, 229 F.3d at 1037 (stating that the plaintiff must rebut each legitimate, non-discriminatory reason when more than one reason is proffered).

Ashtari does not dispute that two clients had previously stated that they did not want to work with him. However, he argues that such was not the real reason for his termination, because these clients complained ten to fifteen years prior to the RIF and he still did work for those clients. The fact that the complaints occurred many years ago does not change the fact that Ashtari was the only person in his subgroup that had any clients that did not want to work with him at some point in time. Defendant was faced with the difficult decision of having to terminate employees that it would not otherwise choose to terminate if not for the RIF, and the fact that Ashtari had two clients who in the past did not want to work with him is a reason that could motivate a reasonable employer to select him for termination. See Licausi, 378 F. App'x at 967 (stating that the court would not second guess the criteria that the company used to compare employees considered for termination in the RIF); Godby, 346 F. App'x at 494 (stating that to the extent the plaintiff argued that other employees would have been better choices for the RIF, the court would not second-guess the business judgment of the defendant). Thus, Ashtari has not shown that this proffered reason is pretext for discrimination.

Likewise, Ashtari fails to show that the other proffered reason—his failure to follow SOPs for quality control the year prior to the RIF—is pretextual. Ashtari points out that at the time of Dixon's deposition in December of 2017, Dixon could not recall the details of the incident. Therefore, Ashtari argues that the incident was an insignificant event that was not the

true motive for his selection for termination. While Dixon may not have remembered the incident well when asked about it at his deposition more than two-and-a-half years later, Ashtari's selection for termination occurred only three months after Dixon signed the written reprimand relating to this incident. Thus, Dixon's failure to remember the details of the incident at the time of his deposition does not show that the incident did not impact his decision to select Ashtari for termination.

Additionally, Ashtari argues that Defendant gave conflicting reasons for his termination—the two reasons discussed above versus the reasons stated on the RIF spreadsheet Defendant created when selecting employees for termination in the RIF. In the spreadsheet, Defendant listed the reasons for Ashtari's termination as redundant skill set and underutilization. (Doc. No. 76-2, p. 5–6). However, these are not conflicting reasons; taken together, these reasons explain why someone needed to be terminated from his subgroup and why he specifically was selected for termination. Because there were too many employees in his subgroup with the same skill set, and because he was underutilized, he was selected for termination in the RIF due to the fact that two clients had previously stated that they did not want to work with him and due to his failure to follow SOPs.

Furthermore, the spreadsheet contained only five specific choices as possible reasons for selection for termination, which were: (1) performance - the employee is on an improvement plan with no improvement; (2) investment under-performance - the area of the business invested in has not resulted in a return on investment; (3) wrong skill set - the employee has a skill set that Defendant does not need; (4) redundant skill set - too many employees have the same skill set, so a reduction in employees is necessary to match the workload; and (5) underutilization - the

employee is not being utilized. The only choices that appropriately described Ashtari's selection for termination in the RIF were redundant skill set and underutilization.

Finally, Ashtari argues that Muir's hiring into the subgroup shortly after Ashtari's termination shows that Ashtari was terminated in favor of younger employees. However, Muir was hired a few months after the RIF, and the availability of that position a few months after the RIF is not evidence that the position was available at the time of the RIF. Furthermore, Ashtari does not contend that he applied for the newly open position for which Muir was hired, nor does Ashtari provide evidence that Muir was hired as an Engineer IV (Ashtari's former position).[22]

Thus, based on the above, the Court finds that Ashtari has not created a genuine issue of material fact regarding pretext. Considering all of the evidence described in this order, the Court concludes that it does not create a convincing mosaic of circumstantial evidence that would allow a jury to find that age discrimination was the but-for cause of Ashtari's termination. Accordingly, the Court grants Defendant summary judgment on Ashtari's age discrimination claim.

## IV. Conclusion

Based on the above, it is ORDERED AND ADJUDGED that:

(1)     Defendant's Motion for Summary Judgment (Doc. No. 61) is **GRANTED**.

(2)     The Clerk is directed to terminate all pending motions, enter judgment in favor of Defendant, and close this case.

---

[22]Based on the list of current employees in Tampa as of August 2016, it appears that Frank A. Muir may have been an Engineer I. (Doc. No. 76-3). The list does not contain employee names; it only lists initials. If Muir is "FAM" on the list, then he was an Engineer I as of August 2016.

**DONE AND ORDERED** at Tampa, Florida, this 21st day of June, 2018.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record